## NEW NEGRO ALLIANCE *v.* SANITARY GROCERY CO.[*]

No. 511. Argued March 2, 3, 1938.—Decided March 28, 1938.

[*]The opinion herein is reported as amended by Order of April 25, 1938, see 304 U. S.

Messrs. *Belford V. Lawson, Jr.* and *Thurman L. Dodson,* with whom *Mr. Theodore M. Berry* was on the brief, for petitioners.

*Mr. A. Coulter Wells,* with whom *Mr. William E. Carey, Jr.* was on the brief, for respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The matter in controversy is whether the case made by the pleadings involves or grows out of a labor dispute within the meaning of § 13 of the Norris-La Guardia Act.[1]

The respondent, by bill filed in the District Court of the District of Columbia, sought an injunction restraining the petitioners and their agents from picketing its stores and engaging in other activities injurious to its business. The petitioners answered, the cause was heard upon bill and answer, and an injunction was awarded. The United States Court of Appeals for the District of Columbia affirmed the decree.[2] The importance of the question presented and asserted conflict with the decisions of this and other federal courts moved us to grant certiorari.

---

[1] Act of March 23, 1932, c. 90, 47 Stat. 70, 73, U. S. C. Tit. 29, § 113.

[2] 67 App. D. C. 359; 92 F. (2d) 510.

As the case was heard upon the bill and a verified answer the facts upon which decision must rest are those set forth in the bill and admitted or not denied by the answer and those affirmatively set up in the answer.

The following facts alleged in the bill are admitted by the answer. Respondent, a Delaware corporation, operates 255 retail grocery, meat, and vegetable stores, a warehouse and a bakery in the District of Columbia and employs both white and colored persons. April 3, 1936, it opened a new store at 1936 Eleventh Street, N. W., installing personnel having an acquaintance with the trade in the vicinity. Petitioner, The New Negro Alliance, is a corporation composed of colored persons, organized for the mutual improvement of its members and the promotion of civic, educational, benevolent, and charitable enterprises. The individual petitioners are officers of the corporation. The relation of employer and employes does not exist between the respondent and the petitioners or any of them. The petitioners are not engaged in any business competitive with that of the respondent, and the officers, members, or representatives of the Alliance are not engaged in the same business or occupation as the respondent or its employes.

As to other matters of fact, the state of the pleadings may be briefly summarized. The bill asserts: the petitioners have made arbitrary and summary demands upon the respondent that it engage and employ colored persons in managerial and sales positions in the new store and in various other stores; it is essential to the conduct of the business that respondent employ experienced persons in its stores and compliance with the arbitrary demands of defendants would involve the discharge of white employes and their replacement with colored; it is imperative that respondent be free in the selection and control of persons employed by it without interference by the petitioners

or others; petitioners have written respondent letters threatening boycott and ruination of its business and notices that by means of announcements, meetings and advertising the petitioners will circulate statements that respondent is unfair to colored people and to the colored race and, contrary to fact, that respondent does not employ colored persons; respondent has not acceded to these demands. The answer admits the respondent has not acceded to the petitioners' demands, but denies the other allegations and states that the Alliance and its agents have requested only that respondent, in the regular course of personnel changes in its retail stores, give employment to Negroes as clerks, particularly in stores patronized largely by colored people; that the petitioners have not requested the discharge of white employes nor sought action which would involve their discharge. It denies the making of the threats described and alleges the only representations threatened by the Alliance or its authorized agents are true representations that named stores of the respondent do not employ Negroes as sales persons and that the petitioners have threatened no more than the use of lawful and peaceable persuasion of members of the community to withhold patronage from particular stores after the respondent's refusal to acknowledge petitioner's requests that it adopt a policy of employing Negro clerks in such stores in the regular course of personnel changes.

The bill further alleges that the petitioners and their authorized representatives "have unlawfully conspired with each other to picket, patrol, boycott, and ruin the Plaintiff's business in said stores, and particularly in the store located at 1936 Eleventh Street, Northwest" and, "in an effort to fulfill their threats of coercion and intimidation, actually have caused the said store to be picketed or patrolled during hours of business of the plaintiff, by their members, representatives, officers, agents, servants,

and employees"; the pickets carrying large placards charging respondent with being unfair to Negroes and reading: "Do your Part! Buy Where You Can Work! No Negroes Employed Here!" for the purpose of intimidating and coercing prospective customers from entering the respondent's store until the respondent accedes to the petitioners' demands. "Said defendants, their pickets or patrols or some of them have jostled and collided with persons in front of the said store and have physically hindered, obstructed, interfered with, delayed, molested, and harassed persons desiring to enter the place of business of the Plaintiff Corporation; said pickets, or some of them, have attempted to dissuade and prevent persons from entering plaintiff's place of business; said defendants, their pickets or patrols are disorderly while picketing or patrolling, and attract crowds to gather in front of said store, and encourage the crowds or members thereof to become disorderly, and to harass, and otherwise annoy, interfere with and attempt to dissuade, and to prevent persons from entering the place of business of the plaintiff, the disorder thereby preventing the proper conduct of and operation of the plaintiff's business. Defendants have threatened to use similar tactics of picketing and patrolling as aforesaid in front of the several other stores of the plaintiff." Four photographs alleged to portray the picketing are annexed as exhibits to the bill. One of them shows a man carrying a sandwich placard on the sidewalk and no one else within the range of the camera. In another, two children are seen beside the picket; in another, two adults; in the fourth, one adult entering respondent's store at a distance from the picket and without apparent interference. The answer denies all these allegations save that it admits the petitioners did, during April 4, 1936, and at no other time, cause the store at 1936 Eleventh Street, N. W., to be continuously picketed by a single person carrying a placard exhibiting

the words quoted by the bill; and the petitioners, prior to the acts complained of in the bill, picketed, or expressed the intention of picketing, two other stores. It admits that the photographs correctly represent the picketing of April 4, 1936. The answer avers the information carried on the placards was true, was not intended to, and did not in fact, intimidate customers; there was no physical obstruction, interference or harassment of anyone desiring to enter the store; there was no disorderly conduct, and the picketing did not cause or encourage crowds to gather in front of the store.

The bill states: "As evidence of the widespread and concerted action planned by the Defendants herein, they have caused to be placed or have permitted to appear in the Washington Tribune . . . the following statements . . ." There follow quotations from articles appearing in the newspaper purporting to report meetings of the Alliance and speeches made thereat. There is no statement that the facts reported in the articles are true. The answer denies that any of the petitioners is connected with or exercises any control over the Washington Tribune or caused or permitted that newspaper to publish any article or news item whatsoever or in any way acted in concert with the newspaper in those publications.

The bill asserts that petitioners and their representatives, officers, and agents, unlawfully conspired to picket, boycott, and ruin the respondent's business in its stores, particularly the store at 1936 Eleventh Street. This is denied by the answer.

The bill says that the described conduct of petitioners will continue until respondent complies with petitioners' demands; is and will continue to be dangerous to the life and health of persons on the highway, to property thereon, and to respondent's employes, its property, and business and will cause respondent irreparable injury; the petitioners' acts are unlawful, constitute a conspiracy in

restraint of trade, and, if continued, will ruin the respondent's business. The answer denies these allegations so far as they constitute assertions of fact.

The case, then, as it stood for judgment, was this: The petitioners requested the respondent to adopt a policy of employing Negro clerks in certain of its stores in the course of personnel changes; the respondent ignored the request and the petitioners caused one person to patrol in front of one of the respondent's stores on one day carrying a placard which said: "Do Your Part! Buy Where You Can Work! No Negroes Employed Here!" and caused or threatened a similar patrol of two other stores of respondent. The information borne by the placard was true. The patrolling did not coerce or intimidate respondent's customers; did not physically obstruct, interfere with, or harass persons desiring to enter the store, the picket acted in an orderly manner, and his conduct did not cause crowds to gather in front of the store.

The trial judge was of the view that the laws relating to labor disputes had no application to the case. He entered a decree enjoining the petitioners and their agents and employes from picketing or patrolling any of the respondent's stores, boycotting or urging others to boycott respondent; restraining them, whether by inducements, threats, intimidation or actual or threatened physical force from hindering any person entering respondent's places of business, from destroying or damaging or threatening to destroy or damage respondent's property and from aiding or abetting others in doing any of the prohibited things. The Court of Appeals thought that the dispute was not a labor dispute within the Norris-LaGuardia Act because it did not involve terms and conditions of employment such as wages, hours, unionization or betterment of working conditions, and that the trial court, therefore, had jurisdiction to issue the injunction. We think the conclusion that the dispute was not a labor dispute

within the meaning of the Act, because it did not involve terms and conditions of employment in the sense of wages, hours, unionization or betterment of working conditions is erroneous.

Subsection (a) of § 13 provides: "A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; . . . or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined)." Subsection (b) characterizes a person or association as participating or interested in a labor dispute "if relief is sought against him or it and if he or it . . . has a direct or indirect interest therein, . . ." Subsection (c) defines the term "labor dispute" as including "any controversy concerning terms or conditions of employment, . . . regardless of whether or not the disputants stand in the proximate relation of employer and employee." These definitions plainly embrace the controversy which gave rise to the instant suit and classify it as one arising out of a dispute defined as a labor dispute. They leave no doubt that The New Negro Alliance and the individual petitioners are, in contemplation of the Act, persons interested in the dispute.[3]

In quoting the clauses of § 13 we have omitted those that deal with disputes between employers and employes and disputes between associations of persons engaged in a particular trade or craft, and employers in the same industry. It is to be noted, however, that the inclusion in the definitions of such disputes, and the persons interested in them, serves to emphasize the fact that the quoted portions were intended to embrace contro-

[3] Compare *Senn* v. *Tile Layers Union,* 301 U. S. 468; *Lauf* v. *Shinner & Co.,* 302 U. S. 323.

versies other than those between employers and employes; between labor unions seeking to represent employes and employers; and between persons seeking employment and employers.

The Act does not concern itself with the background or the motives of the dispute. The desire for fair and equitable conditions of employment on the part of persons of any race, color, or persuasion, and the removal of discriminations against them by reason of their race or religious beliefs is quite as important to those concerned as fairness and equity in terms and conditions of employment can be to trade or craft unions or any form of labor organization or association. Race discrimination by an employer may reasonably be deemed more unfair and less excusable than discrimination against workers on the ground of union affiliation. There is no justification in the apparent purposes or the express terms of the Act for limiting its definition of labor disputes and cases arising therefrom by excluding those which arise with respect to discrimination in terms and conditions of employment based upon differences of race or color.

The purpose and policy of the Act respecting the jurisdiction of the federal courts is set forth in §§ 4 and 7. The former deprives those courts of jurisdiction to issue an injunction against, *inter alia,* giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence; against assembling peaceably to act or to organize to act in promotion of interests in a labor dispute; against advising or notifying any person of an intention to do any of the acts specified; against agreeing with other persons to do any of the acts specified.[4] Section 7 deprives the

---

[4] U. S. C. Tit. 29, § 104.

courts of jurisdiction to issue an injunction in any case involving or growing out of a labor dispute, except after hearing sworn testimony in open court in support of the allegations of the complaint, and upon findings of fact to the effect (a) that unlawful acts have been threatened and will be committed unless restrained, or have been committed and will be continued, unless restrained, and then only against the person or persons, association or organization making the threat or permitting the unlawful act or authorizing or ratifying it; (b) that substantial and irreparable injury to complainant's property will follow; (c) that, as to each item of relief granted, greater injury will be inflicted upon the complainant by denial of the relief than will be inflicted on the defendant by granting it; (d) that complainant has no adequate remedy at law, and (e) that the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.[5]

The legislative history of the Act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act[6] respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of that Act.[7] It was intended that peaceful and orderly dissemination of information by those defined as persons interested in a labor dispute concerning "terms and conditions of employment" in an industry or a plant or a place of business should be lawful; that, short of fraud, breach of the

---

[5] U. S. C. Tit. 29, § 107.

[6] Act of Oct. 15, 1914, c. 323, § 20, 38 Stat. 730, 738, U. S. C. Tit. 29, § 52.

[7] *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443; *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184. Compare House Report No. 669, 72nd Cong., 1st Sess., and Senate Report 1060, 71st Cong., 2nd Sess., and Senate Report 163, 72nd Cong., 1st Sess.

peace, violence, or conduct otherwise unlawful, those having a direct or indirect interest in such terms and conditions of employment should be at liberty to advertise and disseminate facts and information with respect to terms and conditions of employment, and peacefully to persuade others to concur in their views respecting an employer's practices.[8] The District Court erred in not complying with the provisions of the Act.

The decree must be reversed and the cause remanded to the District Court for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE CARDOZO took no part in the consideration or decision of this case.

MR. JUSTICE McREYNOLDS, dissenting.

MR. JUSTICE BUTLER and I cannot accept the view that a "labor dispute" emerges whenever an employer fails to respond to a communication from A, B and C—irrespective of their race, character, reputation, fitness, previous or present employment—suggesting displeasure because of his choice of employes and their expectation that in the future he will not fail to select men of their complexion.

It seems unbelievable that, in all such circumstances, Congress intended to inhibit courts from extending protection long guaranteed by law and thus, in effect, encourage mobbish interference with the individual's liberty of action. Under the tortured meaning now attributed to the words "labor dispute," no employer—merchant, manufacturer, builder, cobbler, housekeeper or what not—who

---

[8] Compare *Senn* v. *Tile Layers Union,* 301 U. S. 468; *Levering & Garrigues Co.* v. *Morrin,* 71 F. (2d) 284; *Cinderella Theatre Co.* v. *Sign Writers' Local,* 6 F. Supp. 164; *Miller Furniture Co.* v. *Furniture Workers Union,* 8 F. Supp. 209.

prefers helpers of one color or class can find adequate safeguard against intolerable violations of his freedom if members of some other class, religion, race or color demand that he give them precedence.*

Design thus to promote strife, encourage trespass and stimulate intimidation, ought not to be admitted where, as here, not plainly avowed. The ultimate result of the view now approved to the very people whom present petitioners claim to represent, it may be, is prefigured by the grievous plight of minorities in lands where the law has become a mere political instrument.

---

* See—definition of Dispute, Webster's New International Dictionary; 29 U. S. C., § 113 (c); Senate Report No. 163, 72nd Congress, 1st Session, pp. 7, 11, 25; House Report No. 669, 72nd Congress, 1st Session, pp. 3, 7, 8, 10, 11.