## TAXI-CAB DRIVERS LOCAL UNION NO. 889 OF OKLAHOMA CITY, OKL., v. YELLOW CAB OPERATING CO.

### No. 2278.

Circuit Court of Appeals, Tenth Circuit.

Nov. 5, 1941.

C. W. Schwoerke, of Oklahoma City, Okl., for appellant.

J. B. Dudley, of Oklahoma City, Okl. (Dudley, Hyde, Duvall & Dudley, of Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS, MURRAH, and WILLIAMS, Circuit Judges.

PHILLIPS, Circuit Judge.

Taxi-Cab Drivers Local Union No. 889, of Oklahoma City, Oklahoma,[1] is an unincorporated association and is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America.[2] International under its charter has jurisdiction over "chauffeurs and helpers, * * * and all who are employed on * * * automobiles, in and around * * * garages, other than mechanics."

---

[1] Hereinafter called the Local.

[2] Hereinafter called International.

On August 23, 1940, the Yellow Cab Operating Company,[3] a corporation organized under the laws of Arizona, was engaged in the taxicab business in Oklahoma City. It leased the cabs and equipment and a garage from the G. C. Harrell Equipment Company. In connection with its taxicab business it also conducted a garage, storage, and baggage business. Its cab drivers were members of the Local. The Operating Company entered into a written contract with the Local running for a period of two years from its effective date, January 17, 1940. The contract covered wages, hours, and working conditions of the cab drivers, provided for a closed shop, and further provided that cab drivers, belonging to the Local, while driving cabs of the Operating Company, would not be required to run or drive through a picket line.

The Operating Company also employed certain additional employees, other than cab drivers and mechanics. On August 23, 1940, it employed two cashiers, three dispatchers, one starter, two baggagemen, one grease man, and five car washers. Shortly prior to August 23, 1940, one of its cashiers, three dispatchers, one baggageman, and five car washers joined the Local. They had been advised by D. A. Baldwin, organizer for the Central Trades and Labor Council and business agent for the Local, that under the charter of International, the Local had jurisdiction over such additional employees. One of the five car washers, James Criss, was employed on August 7, 1940, and remained in the service of the Operating Company until August 23, 1940.

G. C. Harrell was president of the Harrell Equipment Company and was employed on a salary as the agent and adviser of the Operating Company. Harrell had assisted the Operating Company in the negotiation of the contract with the cab drivers.

Some days prior to August 23, 1940, a committee representing the Local presented Harrell with a contract providing for recognition of the Local as a bargaining agent for such additional employees and suggested that the demands be taken up and considered thereafter. Harrell replied if there was to be any bargaining, they had better commence with that, and stated that he did not want to recognize them as sole bargaining agent until he "knew what their bargaining was going to be." Three or four days later the committee presented Harrell with a proposed contract covering Union recognition, working conditions, and wages for such additional employees. The following day Baldwin and one member of the committee called on Harrell and the proposed contract was discussed. Harrell stated that the Operating Company was losing money at the rate of from $800 to $1,200 per month and so long as it continued to operate at a loss, it could not enter into a contract which would increase its operating expenses, and that the proposed contract would increase the expenses approximately $500 per month. The representatives of the Local refused to make any concessions. Harrell refused to sign the proposed contract and turned it over to the officers of the Operating Company on the evening of August 23, 1940. Baldwin advised Harrell that unless the demands were met, he would lock up the business of the Operating Company.

Harrell testified that he did not have authority to sign the contract for the Operating Company. Nevertheless, he assumed to act for the Operating Company and negotiated with the committee.

About 5:50 o'clock P. M., August 23, 1940, Baldwin instructed the dispatcher on duty to ring all stations and tell the cab drivers not to take any calls from cab dispatchers. At 6 o'clock P. M., Baldwin called the dispatcher off duty. It was the duty of the dispatcher to take calls for a cab from patrons and dispatch a cab in answer to the call.

The shifts changed at 6 o'clock P. M. The night porter and cashier came at 6 o'clock P. M., but did not go on duty. Within twenty to thirty minutes a picket line was established around the Operating Company's place of business and the night men began bringing in their cabs. The cab drivers refused to cross the picket line, a right they had reserved in their contract. Within eight hours all of the cabs were brought to the Operating Company's place of business. The day shift for the following day did not take out any cabs. All of the additional employees except one cashier, one starter, one baggageman, and one grease man went out on strike. The Operating Company's taxicab business was entirely closed down. The pickets carried banners reading:

---

[3] Hereinafter called the Operating Company.

"Yellow Cab Company unfair to Teamsters Helpers of Taxi Cab Drivers Local 889."

Certain of the cab drivers participated and took part in the formation, establishment, and maintenance of the picket line.

On August 22, 1940, at about 4 o'clock P. M., R. C. Robinson, vice-president of the Operating Company, learned that there was some labor disturbance between the Operating Company and the additional employees and that Baldwin was trying to negotiate a contract with Harrell. About August 25, 1940, the Local discussed with Robinson and J. W. Grimm, president of the Operating Company, the proposed contract covering such additional employees, but was unable to arrive at any agreement. The Local continued its picketing, later changing the words on the picket signs to read:

"This garage is unfair to helpers' division of the Taxicab Drivers' Local No. 889."

At the time the strike was called and the picket line established on the evening of August 23, 1940, the Operating Company had a storage contract with the Wells-Roberts Hotel and a baggage contract with the Biltmore Hotel. Shortly after the establishment of the picket line, the business agent of the Local orally represented to each of such hotels that the Operating Company was unfair to organized labor and to the Local and advised each hotel if it continued to do business with the Operating Company, the Local would throw a picket line around it. As a result, the hotels ceased their respective business relations with the Operating Company. The strike continued with a complete shut down of the Operating Company's business until August 30, 1940. On that date, the Operating Company sold its taxicab and baggage business to the Y & Y Cab Company, but retained its other business, which included storing and greasing of cars. It also sold gasoline to the general public. The purchasing company immediately signed a union contract with the Local and rehired all of the Operating Company's striking employees, except James Criss, a car washer.

After the Operating Company disposed of the taxicab business it had five employees, two car washers, one cashier, a night man in the garage, and one mechanic, all of whom, except one, were new employees and none of whom belonged to a union.

Because of the refusal to recognize the demands and re-employ Criss the strike and picketing continued.

The picketing was at all times peaceful and was wholly free from any violence.

On September 11, 1940, the Operating Company commenced this action against the Local, its president, vice-president, secretary-treasurer, recording secretary, business agent, and others, including the cab drivers. The complaint contains three causes of action. In the first cause of action, it sought damages for libel, in the second cause of action, damages for slander, and in the third cause of action, injunctive relief against a continuation of the slanderous and libelous statements and publications. The Local filed an answer in response to the third cause of action. It set up that it had a legitimate labor dispute with the Operating Company over union recognition, conditions of employment, and working conditions on August 23, 1940; that the activities of the Local in maintaining the picket line complained of was lawful under § 10878, O.S.1931, 40 Okl.St. Ann. § 166; that the information set out on the signs carried by the pickets was truthful and was in furtherance of the Local's efforts to enforce its legal rights; and that under the provisions of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., the court was without jurisdiction to grant an injunction against peaceful picketing where a labor dispute existed.

The trial court found that the Local had no right to call the strike in question; that it was unreasonable and without just cause; that no labor dispute existed; that the words used on the picket signs were false, untrue, and libelous; that the Local was guilty of maintaining a secondary boycott in attempting to keep customers from trading with the Operating Company and that the Norris-LaGuardia Act had no application. The court further found the defendants to the action were insolvent. It granted a permanent injunction enjoining the Local and the other defendants from libeling or slandering the Operating Company and the picketing of its place of business by the use of the words "Yellow Cab Company unfair to Teamsters Helpers of Taxicab Drivers Local 889" or otherwise stating the Operating Company was unfair to organized labor, and from asserting to the representatives of the Wells-Roberts Hotel that the Operating Company was unfair to organized labor and to the Local.

The injunction provided that it did not restrain the Local and the other defendants from peaceably picketing the place of business of the Operating Company or the Hotel, or using any words or statements upon banners or otherwise truthfully and correctly stating the attitude of the Operating Company toward organized labor, such Local, and its various subdivisions. The Local has appealed.

We pass the question whether Harrell had authority to represent the Operating Company in the negotiations with the Local. He assumed to act in the negotiations, refused to sign the proposed contract and turned it over to an officer of the Operating Company on the evening of August 23, 1940. A few days later a conference was had between the representatives of the Local and officers of the Operating Company respecting the proposed contract and the respective parties were unable to reach an agreement.

Section 13 of the Norris-LaGuardia Act, 29 U.S.C.A. § 113, 47 Stat. 73, in part provides:

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; * * * or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

We think there can be no doubt that after the conference between the representatives of the Local and the Operating Company resulted in a disagreement respecting the proposed contract, a labor dispute existed between the Local and its members and the Operating Company until August 30, 1940. From that date on, the Operating Company continued the business which it retained with new employees, save one, none of whom belonged to a union, refused to recognize the Local, and left Criss unemployed. The latter situation continued until the commencement of the action, so that a labor dispute continued to exist between the Operating Company, the Local, and Criss.

The purpose and policy of the Norris-LaGuardia Act respecting the jurisdiction of the federal courts are set forth in §§ 4 and 7 thereof. 29 U.S.C.A. §§ 104, 107. The former deprives the federal courts of jurisdiction to issue an injunction against, inter alia, giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence. The latter deprives the courts of jurisdiction to issue an injunction in any case involving or growing out of a labor dispute, except after hearing sworn testimony in open court in support of the allegations of the complaint and upon findings of fact to the effect (1) that unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained; (2) that substantial and irreparable injury to complainant's property will follow; (3) that as to each item of relief granted, greater injury will be inflicted upon the complainant by the denial of relief than will be inflicted upon the defendant by granting it; (4) that complainant has no adequate remedy at law; and (5) that the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

And it is intended by the Act that peaceful and orderly dissemination by those defined as persons interested in a labor dispute of information respecting such dispute shall be lawful, and that, short of fraud, breach of the peace, violence, or conduct

otherwise unlawful, those having a direct or indirect interest in such dispute shall be at liberty to give publicity by advertising, speaking, or patrolling, of the existence of the labor dispute and of the facts involved therein, and to peacefully persuade others to concur in their views respecting the merits of such dispute.[4]

■ Publicizing the facts respecting a labor dispute by pamphlet, banner, or word of mouth must now be regarded as a right of free communication guaranteed by the Federal Constitution.[5]

■ Since a labor dispute existed, enjoining the publicizing of the existence of such dispute and of the facts respecting same by the statements on the banners and by the oral statements to the Biltmore Hotel and the Wells-Roberts Hotel was prohibited by the Norris-LaGuardia Act, unless the methods adopted involved fraud or violence.

■ The Local and the Operating Company were unable to reach an agreement on a contract respecting wages, hours, and working conditions and the right of the Local, to whom the majority of such additional employees belonged, to act as their bargaining agent. After the Operating Company sold its taxicab business, it continued to operate its storage, greasing, and gasoline business with five nonunion employees, four of whom were new employees, and left Criss unemployed. Under these circumstances, we do not think the court was justified in finding that the expression of the view that the Operating Company was unfair to the Helpers Division of the Local or to the Local was either libelous or slanderous, or that the Norris-LaGuardia Act was not applicable. It was a mere expression of the Local's viewpoint respecting the dispute.[6] To limit the right of a labor union to employ publicity challenging the fairness of the attitude of the employer to cases where the employer is not justified in denying the union's demands, would greatly curtail the right of free communication. We think the union may express its views concerning the merits of a labor controversy where it acts in good faith and pursues peaceful methods and that to enjoin it from so doing is prohibited by the Norris-LaGuardia Act.

■ The fact that the relation of employer and employee did not exist between the two hotels and the members of the Local and the pressure exerted against the hotels constituted a secondary boycott does not bring the statements made to the hotels within the exceptions of the Norris-LaGuardia Act.[7] The communications to the hotels were within the right of free communication guaranteed by the Federal Constitution.[8]

We conclude that the court erred in granting the injunction. The judgment is reversed and the cause remanded with instructions to dissolve the injunction and dismiss the third cause of action, with prejudice.

---

[4] New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 561-563, 58 S. Ct. 703, 82 L.Ed. 1012.

[5] Senn v. Tile Layers Protective Union, 301 U.S. 468, 478, 57 S.Ct. 857, 81 L. Ed. 1229; American Federation of Labor v. Swing, 312 U.S. 321, 326, 61 S. Ct. 568, 85 L.Ed. 855; Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L. Ed. 1093; Carlson v. California, 310 U. S. 106, 113, 60 S.Ct. 746, 84 L.Ed. 1104.

[6] See American Federation of Labor v. Swing, 312 U.S. 321, 324, 325, 61 S.Ct. 568, 85 L.Ed. 855; Milk Wagon Drivers' Union v. Lake Valley Farm Products Co., 311 U.S. 91, 98, 99, 61 S.Ct. 122, 126, 85 L.Ed. 63. In the case last cited the court said:

"Whether rightly or wrongly, the defendant union believed that the 'vendor system' was a scheme or device utilized for the purpose of escaping the payment of union wages and the assumption of working conditions commensurate with those imposed under union standards. To say, as the Circuit Court of Appeals did, that the conflict here is not a good faith labor issue, and that therefore there is no 'labor dispute', is to ignore the statutory definition of the term."

[7] Wilson & Co. v. Birl, 3 Cir., 105 F.2d 948, 952.

[8] American Federation of Labor v. Swing, 312 U.S. 321, 323-326, 61 S.Ct. 568, 85 L.Ed. 855; Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 93, 94, 96, 100-103, 61 S.Ct. 122, 85 L.Ed. 63.