549 F.2d 173
 94 L.R.R.M. (BNA) 2545, 81 Lab.Cas. P 13,012,
1977-1 Trade Cases 61,272
 UTILITIES SERVICES ENGINEERING, INC., a Colorado Corporation
and Blackinton & Decker, Inc., a Colorado
Corporation, Plaintiffs-Appellants,
v.
COLORADO BUILDING AND CONSTRUCTION TRADES COUNCIL, an
unincorporated association, Defendant-Appellee.
 No. 76-1420.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted Sept. 23, 1976.
Decided Feb. 3, 1977.
 
 Robert G. Good, Denver, Colo., for plaintiffs-appellants.
 Philip Hornbein, Jr., Denver, Colo. (Hornbein, MacDonald & Fattor, Denver, Colo., on the brief), for defendant-appellee.
 Before McWILLIAMS, BREITENSTEIN and BARRETT, Circuit Judges.
 McWILLIAMS, Circuit Judge.
 
 
 1
 The issue is whether the district court had jurisdiction to enjoin certain picketing. The district court concluded that under the several provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101, et seq., it had no jurisdiction to enjoin peaceful picketing which arose out of a "labor dispute." This appeal followed.
 
 
 2
 The action was brought by Utilities Services Engineering, Inc. and Blackinton & Decker, Inc. against the Colorado Building & Construction Trades Council. Both plaintiffs are contractors engaged in the building and construction industry. The defendant is an unincorporated association comprised of various labor unions whose members are engaged in the building and construction industry.
 
 
 3
 From the complaint we learn that Utilities is presently under contract with Johns-Manville Corporation to perform certain electrical maintenance work at the Johns-Manville Research and Development Center located at Ken Caryl Ranch in the County of Jefferson, State of Colorado. Decker is also presently under contract with Johns-Manville to perform certain construction work in progress at the Johns-Manville World Headquarter's building at the same Ken Caryl Ranch. The Research and Development Center, where Utilities performs its electrical maintenance work, is about one and one-half miles from the World Headquarter's building, where Decker is performing its construction work. Decker employs at the World Headquarter's construction site some 450 union craftsmen. Utilities is not a signatory to any collective bargaining agreements with any labor organization.
 
 
 4
 On or about April 5, 1976, the Trades Council threatened in writing to picket Utilities unless and until Utilities entered into an agreement with the Trades Council concerning the subcontracting of work. The letter wherein the Trades Council sought an agreement with Utilities concerning subcontracting work is attached hereto as Appendix A. The agreement itself is referred to as an "Agreement Governing Subcontracting of Construction Site Work," and the salient portions thereof are set forth as Appendix B.
 
 
 5
 Utilities declined to sign the agreement tendered it by the Trades Council, and the latter, on April 22 and 23, 1976, true to its promise, picketed Utilities at the Research and Development Center and distributed handbills to the public in support of its effort to obtain Utilities' signature on the aforementioned agreement. As a result of this picket line at the Utilities job site, i. e., the Research and Development Center, about 450 union craftsmen employed by Decker at the nearby World Headquarter's building construction site refused to work and brought construction at that particular job site to a complete halt.
 
 
 6
 It was in this general setting that Utilities and Decker brought the present action against the Trades Council. Jurisdiction was based on 15 U.S.C. §§ 15 and 26. It was alleged in the complaint that the proposed agreement under its "literal wording" represents an attempt on the part of the Trades Council to engage in a combination or conspiracy which is illegal under the Sherman Act. 15 U.S.C. §§ 1 and 2. Plaintiffs asked for treble damages.
 
 
 7
 In addition to seeking monetary damages the plaintiffs also asked for a temporary restraining order enjoining the Trades Council from further picketing of Utilities and a preliminary and permanent injunction enjoining such continued picketing. When the request for a temporary restraining order came on for hearing the trial judge heard the colloquy of counsel, but took no evidence, as he was of the firm view that under the Norris-LaGuardia Act he was without jurisdiction to enjoin the Council's picketing. On this basis, then, he denied the request for a temporary restraining order. Being of the view that he had no jurisdiction to enjoin, the trial judge similarly denied plaintiffs' request for a preliminary injunction hearing. From these rulings the plaintiffs appeal and seek expedited review under 29 U.S.C. § 110.[1]
 
 
 8
 On oral argument we were advised that the pickets had been withdrawn and hence there was not at that moment an emergency situation, as there would have been if the picketing were continuing. However, the appeal was being pursued because of the possibility, if not indeed a likelihood, that the picket line might at any moment be re-established. We have not been advised that the picket line has been re-established pending disposition on appeal.
 
 
 9
 As indicated, then, the basis for the trial court's denial of the plaintiffs' request for a preliminary injunction was that it lacked jurisdiction under the Norris-LaGuardia Act to enjoin the Council's picketing. We conclude that the trial court was correct in so holding. The trial court expressed doubt that the proposed agreement offended the antitrust provisions of the Sherman Act, but made no express holding on that particular matter.
 
 
 10
 The pertinent parts of the Norris-LaGuardia Act provide as follows: (1) No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute except in strict conformity with the several provisions of the Act (29 U.S.C. § 101); (2) No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons from giving publicity to the facts involved in the labor dispute by advertising, speaking, patrolling or by any other method not involving fraud or violence (29 U.S.C. § 104); and (3) No court of the United States shall have jurisdiction to issue any temporary or permanent injunction in any case arising out of a labor dispute, except after hearing and after a finding of fact by the court that unlawful acts have been threatened and will be committed unless restrained (29 U.S.C. § 107).
 
 
 11
 Utilities initially argues that there is no "labor dispute" between it and the Trades Council, and therefore the Council is not entitled to the immunity granted by the Act. In arguing that there is no existing labor dispute between the parties, Utilities seizes on paragraph 8 in the proposed agreement. We do not read paragraph 8 as being an admission by the Trades Council that there is no labor dispute between it and Utilities. Though by that paragraph the Council did indeed disavow that it was acting as a bargaining agent for Utilities' employees or that it sought to establish terms of employment, other than the payment of the prevailing rate of wages, such is not the equivalent of a concession that the Council does not have a labor dispute with Utilities. Paragraph 8 is just what it purports to state, and nothing more. Utilities attempts to read too much into the language contained in paragraph 8.
 
 
 12
 The term "labor dispute" is defined at 29 U.S.C. § 113. Without setting forth that statute verbatim, we conclude that this is a case growing out of a labor dispute by reason of each of the following, any one of which is sufficient to bring the instant controversy under the Norris-LaGuardia Act: (1) Each of the parties in this case is engaged in the construction industry, or has a direct or indirect interest therein (29 U.S.C. § 113(a)); (2) each of the plaintiffs is an employer and the Union is an association of employees (29 U.S.C. § 113(a)); and (3) there is a controversy concerning a condition of employment of workers employed by subcontractors of Utilities, although the parties to this case do not "stand in the proximate relation of employer and employee" (29 U.S.C. § 113(c)).
 
 
 13
 In determining whether there is a labor dispute in the instant case, New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938) has particular applicability. There members of a black mutual improvement association picketed a grocery store that discriminated against blacks in its employment practices. The Supreme Court held that there was a labor dispute and that the members of the association were interested persons in that dispute to the end that under the Norris-LaGuardia Act the district court was without jurisdiction to enjoin the picketing.
 
 
 14
 In line with New Negro Alliance, see Marine Cooks & Stewards v. Panama Steamship Co., 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960). In Marine Cooks a union of American seamen picketed a foreign ship operated entirely by a foreign crew while temporarily in an American port to protest, among other things, the loss of livelihood to American seamen "to foreign flagships with substandard wages or substandard conditions." Such was held to be a "labor dispute" within the meaning of the Norris-LaGuardia Act, and accordingly, the district court lacked jurisdiction to enjoin such peaceful picketing.
 
 
 15
 As indicated above, it is to us evident that the instant controversy as described in the complaint itself does grow out of a labor dispute under the statutory definition of that term as set forth in 29 U.S.C. § 113. The Trades Council has an obvious and legitimate interest of its own in seeing that employees of subcontractors, even though nonunion, are nonetheless paid the prevailing rate of wage. Subcontractors paying substandard wages would tend to have an edge in any competitive bidding. Understandably, then, the Council sought to have contractors enter into an agreement whereby their subcontractors would be required to pay their employees prevailing wages. The contention by Utilities that the immunities of the Norris-LaGuardia Act do not apply because there is no labor dispute is without merit. There being, then, a labor dispute between Utilities and the Trades Council, it would appear that under 29 U.S.C. § 104 the district court had no power to issue an injunction enjoining the Trades Council from continued picketing which admittedly did not involve fraud or violence. See Taxi-Cab Drivers Local 889 v. Yellow Cab Operating Co., 123 F.2d 262 (10th Cir. 1941) where it was held that if a labor dispute exists, no injunction could issue enjoining the publicizing of the existence of such dispute, or the facts thereof, in the absence of fraud or violence.
 
 
 16
 Notwithstanding that under the prohibition contained in 29 U.S.C. § 104, it would appear that the district court was without jurisdiction to enjoin defendant's peaceful picketing, Utilities argues that the district court was nonetheless vested with jurisdiction to enjoin under 29 U.S.C. § 107. As mentioned above, 29 U.S.C. § 107 provides that if certain procedural requirements are met, a court may issue an injunction where "unlawful acts have been threatened and will be committed unless restrained." Utilities argues that the proposed agreement would be in violation of the Sherman Act, and hence unlawful. Therefore, according to Utilities, the district court, under the Act itself, had jurisdiction to enjoin the threatened unlawful act. On the other hand, the Trades Council contends that under the facts as pleaded in the complaint, § 107 does not vest the district court with jurisdiction to issue an injunction. We agree with the Trades Council.
 
 
 17
 In Milk Wagon Drivers' Local 753 v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940) the Supreme Court held that federal courts do not have jurisdiction to grant injunctions in cases growing out of labor disputes merely because alleged violations of the Sherman Act are involved. In Milk Wagon the defendant Union was charged with conducting a secondary boycott in violation of the Sherman Act. In Lee Way Motor Freight Lines, Inc., 126 F.2d 931 (10th Cir. 1942) the Tenth Circuit held that the Motor Carrier Act, a non-labor act as is the Sherman Act, did not operate to enlarge, beyond the limits of the Norris-LaGuardia Act, the jurisdiction of a federal court to issue a restraining order or injunction in a case involving a labor dispute.
 
 
 18
 We are aware that in Allen Bradley Co. v. Local 3, International Bhd. of Electrical Workers, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), the Supreme Court held that an injunction could issue where certain labor unions combined with employers and manufacturers of electrical goods to restrain competition and to monopolize the marketing of such goods in interstate commerce. The Court recognized that the problem before it in Allen Bradley was a "very narrow one" when it phrased the question to be resolved as follows: "(D)o labor unions violate the Sherman Act when, in order to further their own interests as wage earners, they aid and abet business men to do the precise things which the Act prohibits?"
 
 
 19
 Allen Bradley did not purport to overrule Milk Wagon and in fact made no mention of Milk Wagon. To us Allen Bradley would appear to be simply a narrow exception to the general rule as announced in Milk Wagon. And in our best judgment the instant case is governed by the general rule, and not the exception.
 
 
 20
 Subsequent to Allen Bradley the Supreme Court has given evidence of continued support to the rule of Milk Wagon. In Order of R. R. Telegraphers v. Chicago & N. W. Ry., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960), in a footnote at page 339, 80 S.Ct. at page 766, the Court declared as follows:
 
 
 21
 Of course, a holding here that mere unlawfulness under any law is enough to remove the strictures of the Norris-LaGuardia Act would require a modification or abandonment of our statement that "For us to hold, in the face of this legislation (the Clayton and Norris-LaGuardia Acts), that the federal courts have jurisdiction to grant injunctions in cases growing out of labor disputes, merely because alleged violations of the Sherman Act are involved, would run counter to the plain mandate of the (Norris-LaGuardia) Act and would reverse the declared purpose of Congress." Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 103, 61 S.Ct. 122, 128, 85 L.Ed. 63. See also Lee Way Motor Freight v. Keystone Freight Lines, 10 Cir., 126 F.2d 931, 934.
 
 
 22
 In accord with R. R. Telegraphers, see Brotherhood of R. R. Trainmen v. Chicago River & Ind. R. R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).
 
 
 23
 The recent case of Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) has facts somewhat similar to those in the instant case, but is not helpful in disposing of the present controversy for the reason that the Supreme Court did not reach the issue as to whether an injunction would lie. In Connell the Court, by way of a declaratory judgment, held that a union was subject to the antitrust laws when it attempted to obtain an agreement from certain contractors that in subcontracting they would only deal with firms that were parties to the union's current collective bargaining agreement. The Court did not hold that such an agreement in fact violated the antitrust laws, only that the union was subject to the antitrust laws, and by footnote went on to state that under the circumstances there was "no occasion for us to consider whether the Norris-LaGuardia Act forbids such an injunction where the specific agreement sought by the union is illegal . . .."
 
 
 24
 Counsel for Utilities agrees that the Supreme Court in Connell "left open" the precise question now before us, but asks us to exercise a degree of prescience and hold that in the instant case the Supreme Court would hold that the trial court had jurisdiction to issue an injunction notwithstanding the Norris-LaGuardia Act. We decline to forecast or anticipate that the Supreme Court would retreat from Milk Wagon and hold that the trial court in the instant case had the power to issue an injunction banning peaceful picketing.
 
 
 25
 Judgment affirmed.
 
 APPENDIX A
 Re: KEN-CARYL RANCH
 Gentlemen:
 
 26
 We are presently engaged in a program to eliminate substandard wages in the construction industry in this area. To assist in accomplishing this, we are requesting builders, general contractors, and project managers to sub-contract jobsite work only to contractors who agree to pay prevailing rates of wages to their employees. A proposed draft of such agreement is enclosed for your consideration. You will note that it applies only to future work for which no sub-contract has been executed, and does not cover any work performed by employees who have a collective bargaining representative.
 
 
 27
 We intend to acquaint the public, by means of picketing and other forms of communication, with the names of builders, general contractors and project managers who do not enter into our sub-contracting agreement for prevailing wages. In the event that your company is the subject of such picketing, it will be conducted at your general offices and other places in which you may be engaged in business. The picketing will be directed to the public, and not to your contractors, suppliers or employees. Its sole purpose will be to publicize the fact that you are not a party to our prevailing wage sub-contracting agreement. We wish to emphasize that we are not requesting or seeking, and do not desire, you to cease or refrain from doing business with any person, firm or corporation. Nor do we claim to represent, or seek to organize, any of your employees or employees of any sub-contractor, or to bargain for them.
 
 
 28
 If you have any comment or question concerning this matter, please communicate the same by letter, which will be referred to our Executive Board for appropriate consideration and action. Neither the undersigned, nor any other person, has authority to discuss this matter in behalf of the Council.
 
 
 29
 Very truly yours,
 
 
 30
 COLORADO BUILDING AND CONSTRUCTION TRADES COUNCIL
 
 APPENDIX B
 
 31
 AGREEMENT GOVERNING SUB-CONTRACTING OF CONSTRUCTION SITE WORK
 
 
 32
 THIS AGREEMENT, entered into by and between Utilities Services Engineering, Inc., hereinafter called "Contractor", and the COLORADO BUILDING AND CONSTRUCTION TRADES COUNCIL, hereinafter called "Council",
 
 WITNESSETH:
 
 33
 WHEREAS, the parties recognize that efficient and economical building construction requires the maintenance of reasonable standards of compensation for construction workers, and
 
 
 34
 WHEREAS, it is the purpose and intention of the contracting parties to encourage employers in the construction industry to provide fair rates of compensation for their employees, and
 
 
 35
 WHEREAS, the parties to this Agreement recognize and intend to protect the right of each party to freely engage in business with any person, corporation or association of its choice without hindrance, impediment or restraint,
 
 
 36
 NOW, THEREFORE, in consideration of the premises and the mutual covenants and promises contained herein, it is mutually agreed by and between the parties as follows:
 
 
 37
 1. This contract shall govern, and be limited to, labor performed at the site of construction, alteration, painting, or repair of building, structure, or other work of the Contractor by sub-contractors, and shall be limited to work which is not customarily performed by employees of the Contractor. This Agreement shall not apply to work on any project for the performance of which the Contractor has entered into a sub-contract on or before the date of execution of this Agreement. Nor shall this Agreement apply to any work performed by any employee or employees in a certified or recognized collective bargaining unit, or by any employee or employees who have a representative for collective bargaining.
 
 
 38
 3. It shall be the obligation of the Contractor to include in every sub-contract for work governed by this Agreement a provision requiring the payment of prevailing rates of wages for such work. In the event any sub-contractor shall fail to pay its employees the prevailing rates of wages for work within the scope of this Agreement, the Contractor shall make whole the employees of sub-contractor for all losses and damages which they sustain by reason of the sub-contractor's default.
 
 
 39
 4. The Contractor further agrees that it will not permit any sub-contractor, or the employee of any sub-contractor, to perform any work within the scope of this Agreement, unless the sub-contractor has entered into a written agreement with the Contractor agreeing to pay its employees the prevailing wage rates for all work governed by this Agreement.
 
 
 40
 8. It is understood and agreed by the parties that the Council is not the collective bargaining representative of any employee, and therefore, nothing herein shall be construed to recognize the Council as the collective bargaining representative of any employee or employees, or to supersede any collective bargaining contract presently, or hereafter, in effect, or to derogate in any way from the authority of any collective bargaining representative of employees of the Contractor or the sub-contractor. Nor shall any provision in this Agreement be construed to establish rates of compensation, conditions of work, or terms of employment for any employees of the Contractor, or of a sub-contractor.
 
 
 41
 9. As used herein the term "prevailing rate of wage" means that rate of wages paid in the area in which the work is to be performed to the majority of workers employed in that classification in construction in the area similar to the proposed undertaking. In the event that there is not a majority of workers paid at the same wage rate, then the wage rate paid to the greater number of workers shall be deemed to be the prevailing wage rate.
 
 BARRETT, Circuit Judge, dissenting:
 
 42
 I respectfully dissent.
 
 
 43
 In my view the picketing conducted by Council at the Utilities construction site was not undertaken to seek assurance that Utilities' subcontractors pay their employees the "prevailing wage rate" but rather and only as a pretext for an object of "recognition" or "bargaining" in violation of the 1959 amendment to the NLRA, i. e., enactment of Section 8(b)(7) by the Landrum-Griffin Act. This amendment was enacted to correct the abuses of picketing exercised by labor. This section, in its prohibited application, requires only that recognition or organization be an object, not that it be the sole object.
 
 
 44
 The key aspect of this controversy is whether there existed a "labor dispute" which would vest exclusive jurisdiction in the NLRB and deny jurisdiction to the district court. I depart from the finding of the trial court and the holding of the majority opinion that a "labor dispute" existed. There is no labor dispute absent a controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee. This record evidences nothing to the effect that Utilities and the subcontractors on the Johns-Manville Research Center construction project, which was picketed because Utilities refused to execute the agreement proposed by Council relating to the payment of "prevailing rates of wages," were in fact paying any employee less than the prevailing wage. The objective of picketing must be determined from facts presented in order to ascertain the Union's overall conduct. Significantly, the record does not reflect that any employees engaged in work at the Utilities project being picketed "walked off" of the job or created a work stoppage.
 
 
 45
 I submit that there is evidence of the true objective sought by Council, i. e., "recognition" or "bargaining," notwithstanding the disclaimers contained in the Appendix A agreement: that evidence lies in the fact that Union members, some 450 strong, affiliated with Council and employed by Decker and/or subcontractors at the nearby Johns-Manville's World Headquarters building construction site "walked off" of that job bringing construction there to a complete halt. In my view, it was no coincidence that this "chain on events" came to pass. It was pre-arranged with one goal only: that of compelling "recognition" and "bargaining." The disavowal by Council in the Appendix A agreement that it is in nowise representing employees of Utilities or its subcontractors on the construction project in terms of wages, conditions of work, or terms of employment is a sham when matched by the actions of Council and its affiliated unions. Some arguable credence could be given a contention of the existence of a "labor dispute" at the picketed situs if Union members there employed had walked off, even lacking proof that any employees there were being paid less than the contended for prevailing wage. However, the 450 Union members walked off at an entirely different situs, that of the Decker construction project at Johns-Manville's World Headquarters building somewhat over a mile removed from the Utilities project. The sole justification advanced by Council for the picketing and the resultant work stoppage is found in Utilities' refusal to sign the agreement. Under the circumstances, this case also meets the condemnation set forth in dicta in Connell Co. v. Plumbers and Steamfitters, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), when the Court stated that the agreements there in issue would have compelled the general contractor to indiscriminately exclude nonunion subcontractors from a portion of the work market, even if their competitive advantages were not derived from substandard wages and working conditions but rather from more efficient operating methods. 421 U.S., at p. 623, 95 S.Ct. 1830.
 
 
 46
 I would grant the injunctive relief sought by appellants.
 
 
 
 [1]
 The trial court retained jurisdiction of the plaintiffs' claim for treble damages