MATSON NAV. CO. et al. v. SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA et al.

Civ. No. 5518.

United States District Court, D. Maryland.

Sept. 29, 1951.

David R. Owen, Semmes, Bowen & Semmes, Baltimore, Md., for plaintiffs.

Sol C. Berenholtz, Solomon Kaplan and Charles B. Heyman, Baltimore, Md., for defendants.

WILLIAM C. COLEMAN, Chief Judge.

. This is a suit for relief by injunction against picketing. There are two plaintiffs, the Matson Navigation Company and the Pacific Maritime Association, both California corporations with their main offices in San Francisco. Matson owns and operates vessels in foreign and domestic trade, and some of these vessels use the port of Baltimore. The other plaintiff, Maritime, is a non-profit organization engaged in the business of promoting the interest of its various members, that is, Matson and other steamship lines, including the conduct of negotiations on their behalf with maritime labor unions and making contracts with them.

Originally this suit was brought against three defendants, two of them maritime unions, namely, Seafarers International Union of North America, and Brotherhood of Marine Engineers, and the third defendant, Earl Sheppherd, a citizen of Maryland with place of business in Baltimore, he being sued individually and as agent of both of the aforementioned unions, which agency is admitted as to the Atlantic & Gulf District, Seafarers' International Union. However, at the inception of the trial of this case, the plaintiffs dismissed the suit

against both unions for want of federal jurisdiction. So, the suit has proceeded against the single defendant, Earl Sheppherd.

Plaintiffs originally sought a temporary restraining order, but the Court refused this and granted plaintiffs merely an order directed against defendant to show cause why the injunctive relief prayed for in the complaint should not be granted. The case has been fully heard on this order.

The following facts which are stipulated into the case give rise to the present litigation and to the plaintiff's claim that they are entitled to an injunction against defendant Shepph_erd, enjoining him from engaging in the picketing in Baltimore Harbor of the Steamship Hawaiian Banker, owned and operated by Matson, as well as any other vessel owned or operated by Matson or by any of the other designated member companies of the other plaintiff, the Pacific Maritime Association, and from otherwise causing work stoppages incident to the steamship operations of Matson or any of these other companies:

On September 6, 1951, the Steamship Hawaiian Banker arrived at pier 8, Canton Railroad, Baltimore, with a general cargo which it was contemplated would have been completely discharged and the vessel would have departed from that pier not later than September 7th. However, during the evening of September 6th, the defendant, Earl Shepphuerd, was responsible for the formation of a picket line at the head of the dock where the Steamship Hawaiian Banker was berthed and has continued to be, responsible for the maintenance of this picket line up to the present time, which has consisted of certain members of the Brotherhood of Marine Engineers, but predominantly of members of the Atlantic & Gulf District Seafarers International Union who were willing to assist the Brotherhood of Marine Engineers in maintaining this picket line. Both of these unions are affiliates of the American Federation of Labor. A twenty-four hour watch system has been established and pickets stationed in accordance therewith. The institution of this picketing resulted from a telegram sent September 5th to Matson by one Charles King, Secretary-Treasurer of the Brotherhood of Marine Engineers which, and the Seafarers International Union of North America, were, as already explained, the unions originally joined as defendants in this suit, the individual defendant, Earl Shepphuerd, representing the latter union's branch in Baltimore. This telegram, in substance, stated that the sender, Charles King, was the representative of a majority of the licensed engineers aboard Matson vessels and that he requested a conference for the purpose of negotiating an agreement covering wages, hours and working conditions for these engineers at an early date. Matson replied to this telegram, explaining that it is a member of the Pacific Maritime Association, with headquarters in San Francisco, that this Association is authorized to and does represent it, along with other American flag operators on the Pacific coast, with respect to all collective bargaining and labor relations with unions representing seafaring personnel, including licensed engineers; that through this Association, Matson is a party to a collective bargaining agreement with the Marine Engineers Beneficial Association effective until June, 1953, by the terms of which, Marine Engineers Beneficial Association has been and is recognized by Matson and the other steamship companies referred to, which are members of the Pacific Maritime Association; and that therefore any further communications concerning the subject matter of the telegram should be directed to the last named Association as the duly authorized collective bargaining representative of Matson and the other steamship companies. No reply to this letter was received by Matson from King or others on his behalf. The picketing continued as aforesaid. It has been peaceful, and without any physical violence or efforts at intimidation. It has consisted of not more than six persons at any one time and there has been no blocking of the approach to the pier at which the Hawaiian Banker is berthed. But the pickets have continuously carried placards all bearing either one or the other of the following, or very similarly worded notices: "Brother-

hood of Marine Engineers urges you Respect this A.F. of L. Picket Line against 'Hawaiian Banker' Matson Steamship Co." "Brotherhood of Marine Engineers A.F. of L. Urges all Marine Engineers to join! B.M.E. This is an A.F. of L. Picket Line."

As a result of this picket line, longshoremen belonging to the International Longshoremen's Association, which is also an American Federation of Labor affiliate, have consistently refused to cross this line since the evening of September 6th, with the result that since Matson is dependent upon such longshoremen, no cargo has been discharged from the Hawaiian Banker since that time. Also, as a result of this picket line, the unlicensed members of the crew of the deck department of the vessel who belong to the Sailors' Union of the Pacific, also an affiliate of the American Federation of Labor, requested that they be and they were paid off by the master of the vessel, with the result that there are at present no unlicensed deck personnel aboard her.

The Atlantic & Gulf District, Seafarers International Union, A.F. of L., have no contract with the plaintiffs, nor do they desire to contract, since the deck department personnel aboard the Hawaiian Banker and other vessels owned by the plaintiffs are all members of an affiliated A.F. of L. organization, namely, the Sailors' Union of the Pacific. On June 15, 1951, one of the present plaintiffs, Pacific Maritime Association, on behalf of its member companies, including Matson, entered into a two year contract with the Marine Engineers Beneficial Association which is a C.I.O. union, covering the licensed engineers aboard their vessels, which is the contract already referred to and explained in Matson's reply of September 7th to the telegram of Charles King of September 5th.

It is further stipulated that these licensed engineers are all "supervisor" employees and therefore it has not been, nor is it now necessary for the Marine Engineers Beneficial Association, C.I.O., to be certified by the National Labor Relations Board as the representative of Matson's engineers for the purpose of collective bargaining; and similarly, that the Brotherhood of Marine Engineers, Seafarers International Union, A.F. of L., has not been, nor is it now necessary for it to be certified by the National Labor Relations Board for the purpose of collective bargaining with Matson or other steamship companies.

The plaintiffs make two major contentions: First, that the present controversy is not a "labor dispute" within the definition of that term as embodied in the Norris-La Guardia Act, 29 U.S.C.A. §§ 101–115, and therefore claim that jurisdiction of this Court may be rested solely upon the diversity of citizenship statute; and second, that even if it is a labor dispute, the unlawful character of the present picketing warrants injunctive relief.

On the other hand, defendant Sheppherd maintains, and has filed a motion to the effect that the complaint must be dismissed because (1) it does involve a "labor dispute" within the meaning of that term as employed in Section 113 (a), (b) and (c) of the Norris-La Guardia Act; and (2) that the labor unions originally named as defendants, but over which it is conceded this Court has presently no jurisdiction, are indispensable parties.

Pursuant to Section 7 of the Norris-La Guardia Act, 29 U.S.C.A. § 107, this Court has no jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute as defined in that Act, unless all of the following facts are found: (1) unlawful acts on defendant's part; (2) substantial and irreparable injury to complainant; (3) greater injury to complainant by denial of the relief sought than to the defendant by granting such relief; (4) absence of an adequate remedy at law available to complainant; and (5) public officers charged with the duty of protecting complainant's property are unwilling or unable to furnish adequate protection. Plaintiffs concede that they are not able to prove the existence of every one of these five prerequisites, especially the fifth. However, they claim that they need not do so because the present controversy does not involve or grow out of a "labor dispute" as that term is defined in the Norris-La Guardia Act. They

734

assert that this is solely retaliatory action on defendant's part; that the real motive of the Brotherhood of Marine Engineers' picket line is entirely retaliatory and not in any sense a bona fide organizational effort or membership drive by that union.

In order to determine whether the plaintiffs are entitled to equitable relief on this ground, it is necessary to examine the provisions of the Norris-La Guardia Act defining a "labor dispute" and to understand and apply to the facts before us the judicial interpretation to be given to these provisions.

The pertinent provisions of the Act are contained in Section 13(a), (b) and (c), 29 U.S.C.A. § 113(a), (b) and (c) and read as follows: "When used in sections 101–115 of this title, and for the purposes of such sections—"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interest in a 'labor dispute' (as defined in this section) of 'persons participating or interested' therein (as defined in this section).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

It is to be noted that paragraph (c) of Section 13 defines what is included in the term "labor dispute"; that paragraph (a) defines when a case shall be held to involve or to grow out of a labor dispute and that paragraph (b) defines when a person or association shall be held to be a participant or to be interested in a labor dispute, this method of definition being employed for the purpose of harmonizing the complete definition with the language of Section 7 of the Act, 29 U.S.C.A. § 107 heretofore analyzed which denies jurisdiction to federal courts to issue injunctions in any case "involving or growing out of a labor dispute" as defined in the Act, except upon the specific conditions set forth in Section 7.

Upon close analysis of paragraph (a) of Section 13 it will be seen that seven different situations are there stated, each of which is held "to involve or to grow out of a labor dispute", as the last two words are defined in paragraph (c); that paragraph (b) defines "person participating or interested" in a "labor dispute", and that paragraph (c) specifically defines the term "labor dispute."

Having thus dissected Section 13, it is now appropriate to analyze the facts in the present case as disclosed not only by the agreed statement of facts that has been stipulated into the case, the essential parts of which we have already set forth, but also as disclosed by the testimony presented at the hearing, in order to determine whether the picketing complained of does "involve or to grow out of a labor dispute" as defined in Section 13. If it does, then, however inequitable a denial to the plaintiffs of injunctive relief may be, this Court is without jurisdiction to grant it.

In addition to the defendant Sheppherd, testimony of five witnesses was given: that of a vice-president of Matson in charge of East-coast operations; of the chief engineer and the chief mate of the Hawaiian Banker; of the secretary of the local Master, Mates and Pilots Union, an affiliate of the A.F. of L. who testified that he informed the mates on the Hawaiian Banker that they could remain aboard her, but that she could not sail; and of a representative of the stevedoring company that was accustomed to supply Matson with stevedore labor on demand, who testified that after the evening of September 6th he was unable to meet the demand that he had from Matson in connection with unloading the Hawaiian Banker because the stevedores were members of the A.F. of L. union and refused to work on the Hawaiian Banker since the picket line had been set up against the vessel.

While the Vice President of the Matson Line testified that it was impossible accurately to compute the total loss that his company was undergoing daily as a result of the picketing, he stated that every day that the Hawaiian Banker is caused by the picketing to lie idle in Baltimore, it is costing approximately $2,500; that in addition to this loss there are much greater losses to be computed on account of general disruption of the schedule of this vessel and the company's other vessels; the abnormal accumulation of cargo in different ports; loss of passengers, and of business and good will generally, that will be transferred to competing lines. He summarized his figures by saying that actual out-of-pocket cost to his company for twelve days of picketing was $35,000 with respect to the Hawaiian Banker alone, and that the general loss of revenue for the same period might amount to more than $200,000.

The defendant Sheppherd testified that he established the picket line at the direction of King, the secretary-treasurer of the Brotherhood of Marine Engineers. A. F. of L.; that he personally had no prior knowledge that the engineers on the Hawaiian Banker had been organized under the C.I.O. union; and that the picketing was bona fide and for the definite purpose of A.F. of L. union organization. This testimony was not convincing in the face of all of the other circumstances that we find existed.

We find that the agitation between the two unions here involved stems from the fact that the Isthmian Steamship Company, a competitor of plaintiffs with which plaintiffs have no interlocking connection, had until June, 1951, a collective bargaining agreement with the Marine Engineers Beneficial Association a C.I.O. union. After this agreement expired, renewal negotiations broke down in July–August 1951. Isthmian then signed a labor agreement with the Brotherhood of Marine Engineers, an A.F. of L. union. Thereupon, the Marine Engineers Beneficial Association protested and picketed all Isthmian ships in California. Isthmian then obtained a State court restraining order against this picket line. While this California restraining order dissolved the picket line, nevertheless the West Coast longshoremen (members of the International Longshoremen's and Warehousemen's Union—"I.L.W.U."—formerly a C.I.O. union and still very antagonistic to the A.F. of L.) continued to support the Marine Engineers Beneficial Association's protest against Isthmian. They refused to handle cargo for Isthmian ships, and in effect continued to recognize what has been termed an "invisible" picket line, although no actual picket lines have been continued by the M.E.B.A. As retaliation for the recognition by the West Coast longshoremen of this "invisible" M.E.B.A. picket line against Isthmian, the B.M.E. set up picket lines at the piers of those West Coast steamship companies that had existing labor agreements with the M.E.B.A. Thereupon, the Pacific Maritime Association, on behalf of affected member steamship companies, including Matson, obtained, on August 28, 1951, a State court temporary restraining order in California against the B.M.E., and its picket lines were dissolved in California under this order, which continues in effect. B.M.E. next sought in other jurisdictions to continue the picketing enjoined in California. In consequence, American President Lines' vessels at Staten Island and in New Jersey were picketed on

September 4th and thereafter, except as restrained by orders of State courts. It is to be noted, however, that this court has not been advised of any injunction having been granted by any federal court under like circumstances. Indeed, all of these related proceedings were instituted in State, never in federal courts.

Except for the King telegram of September 5th, there is nothing in the case to indicate that the defendant unions had any intention to seek, or did seek to arrange terms or conditions of employment. We believe that this telegram was merely a subterfuge, an attempt to make what was in fact purely an effort at reprisal, appear to be a bona fide labor dispute. We say this because similar picketing had already started in New York prior to the date of this telegram, against the American President Lines. The known bargaining agency of Matson had never been approached, in spite of the fact that the defendant union knew that the C.I.O. contract with plaintiffs came up for renewal on June 15th. Furthermore, the renewed contract was in effect two and a half months before any action whatsoever was taken by any A.F. of L. union representatives. There is no proof that up to the present moment any one has approached the engineers of the Hawaiian Banker for the purpose of soliciting them. The A.F. of L. engineers union was unknown to this vessel's engineers until the picketing started on September 6th; as a result of which there has been a complete stoppage of work on the vessel by (1) stevedores, (2) the vessel's unlicensed deck personnel, and the vessel's mates were under their union direction not to help sail the vessel, all of whom are members of unions affiliated with the A.F. of L. Thus, we are satisfied that the real purpose of the picketing was to effect a reprisal for what the C.I.O. Maritime Union had accomplished on the West Coast by obtaining a State court injunction against similar picketing. If there were any real doubt about this being a fact, such doubt is dispelled by a statement which appeared in the issue of September 7, 1951, of the "West Coast Sailor", the official organ of the Sailors' Union of the Pacific, an affiliate of the Seafarers International Union, of whose branch the present defendant Sheppherd is the local Baltimore representative. That statement is signed by one Harry Johnson, Assistant Secretary of the Sailors' Union of the Pacific, of which one Lundeberg is head, and also head of the Seafarers International Union. That statement is as follows: "I want to make it clear to the membership how this beef got started. The Brotherhood of Marine Engineers, affiliated with the SIU of A.F. of L. who have their headquarters in New York, was requested about a year and a half ago by approximately 90 per cent of all the engineers aboard all the Isthmian Line ships to step in and take them over inasmuch as they were dissatisfied with their own union, the MEBA-CIO. The Brotherhood of Marine Engineers did step in and organize them and then signed a contract with the Isthmian Line for all the engineers, which was a better contract than the engineers had under the MEBA.

"This contract was perfectly legitimate and binding in every respect, however, the MEBA threw a picket line around all the Isthmian Line vessels here on the West Coast and the longshoremen refused to go through this picket line although it was strictly a jurisdictional picket line. The longshoremen was the only union that did respect this picket line, all other unions disregarded it as they knew it was only a jurisdictional picket line.

"In retaliation the Brotherhood of Marine Engineers then threw a picket line around vessels under MEBA contracts and some of these ships were SUP ships and naturally we respected their picket line; and the entire AFL labor movement went on record to support the Brotherhood of Marine Engineers in their beef.

"The picket lines were only up for about two days when an injunction was issued against them, followed by another injunction against the MEBA prohibiting them from picketing the Isthmian Line ships. All the picket lines were taken down but the ILWU is still respecting what they call a ghost or phantom picket line against the Isthmian Steamship Company, although they are working the ships that were pick-

etcd by the Brotherhood of Marine Engineers.

"This only shows how phony some organizations can get and as long as the longshoremen are taking this position, in all probability the BME will take further retaliatory measures and only time will tell how this beef will eventually turn out."

We turn now to the question whether the aforegoing facts as we find them "involve" or "grow out of a labor dispute" within the meaning of Section 13 of the Act. We conclude that they do for the following reasons:

There are seven situations set forth in Section 13(a) of the Act (which we have previously quoted in full) as constituting a case that is held "to involve or to grow out of a labor dispute". We believe that the facts in the present case fall within four of these situations. These four situations are the 1st, 2nd, 6th and 7th of those set forth. The 1st "involves persons who are engaged in the same industry  *  *"; and the 2nd, those who "have direct or indirect interest therein." Both of these situations of course exist in the present case. The 6th "involves a dispute between one or more employees or associations of employees." Clearly, this exists in the present case. The two unions here involved, one an affiliate of the C.I.O. and the other of the A.F. of L., have carried their dispute, which arose on the Pacific Coast, to the port of Baltimore. The 7th specified situation is one that "involves any conflicting or competing interests in a 'labor dispute' (as defined in this section [paragraph (c)]) of 'persons participating or interested' therein (as defined in this section [paragraph (b)])." Paragraph (c) includes in the term "labor dispute" not only "any controversy concerning terms or conditions of employment," but also *"concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."* (Emphasis supplied). Clearly, apart from the motive that underlies it, the marine engineers in the A.F. of L. picketing union have

raised with the C.I.O. marine engineers employed on the Hawaiian Banker a controversy over "representation of persons in  *  *  *  seeking to arrange terms or conditions of employment" with Matson. This fact being so obvious, little need be said about the language of paragraph (b) of Section 13 which defines "a person participating or interested in a labor dispute" as one against whom "relief is sought", and if he "is engaged in the same industry  *  *  *  in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation." Again, the picketing A.F. of L. marine engineers fall precisely within this definition.

While all three of the paragraphs of Section 13 which we have dissected and analyzed—and the remaining paragraph (d) is not related to the same subject matter—are far from being a model for conciseness and clarity of statutory draftsmanship, nevertheless after such complete examination, we are satisfied with respect to two things: (1) that these paragraphs must be considered together—that it is not permissible, as counsel for plaintiff contends, to give more weight to the language of paragraph (c) than to that of paragraph (a); and (2) that when so treated as a whole they embrace the controversy which has resulted in the picketing.

We believe that the authorities clearly support our conclusion. In Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872, the facts were these: An unincorporated labor union demanded of an employer (who operated several meat markets) that he require all his employees, none of whom belonged to the union, on pain of dismissal, to join it and make it their bargaining agent. The employees, though left free in the matter by the employer, refused to join, having an organization of their own. The employer having rejected the demand, the members of the union, for the purpose of coercing him and in a conspiracy to destroy his business if he refused to yield, caused false and misleading signs to be placed before his mar-

kets, and persons who were not his employees to parade and picket before his markets, and by threats and intimidation prevented existing and prospective patrons of the employer from patronizing his markets, all of which resulted in irreparable injury to him. The Supreme Court held that this was a "labor dispute" within the meaning of both the Labor Code of Wisconsin where the acts complained of occurred and whose laws therefore governed the substantive rights of the parties, and also within the meaning of the Norris-LaGuardia Act. After analyzing Sections 7 and 13(c) of the Act, the Court said (Mr. Justice Roberts) 303 U.S. 323, at 330, 58 S.Ct. 578, at 582, "There can be no question of the power of Congress thus to define and limit the jurisdiction of the inferior courts of the United States. The District Court made none of the required findings save as to irreparable injury and lack of remedy at law. It follows that in issuing the injunction it exceeded its jurisdiction.

"*Fourth.* The Court of Appeals erred in holding that the declarations of policy in the Norris-LaGuardia Act and the Wisconsin Labor Code, to the effect that employees are to have full freedom of association, self-organization, and designation of representatives of their own choosing, free from interference, restraint, or coercion of their employers, puts this case outside the scope of both acts, since respondent cannot accede to the petitioners' demands upon it without disregarding the policy declared by the statutes. This view was expressed in the court's first opinion on the appeal from the issue of an interlocutory injunction, and the opinion on the appeal from the final order adopts what was said on the earlier appeal as the law of the case. We find nothing in the declarations of policy which narrows the definition of a labor dispute as found in the statutes. The rights of the parties and the jurisdiction of the federal courts are to be determined according to the express provisions applicable to labor disputes as so defined."

In New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012, a philanthropic association of Negroes, not a labor union, picketed one of the stores of a grocery company located in a colored district of Washington, with the object of causing the hiring of colored clerks. None of the members of the picketing association had worked at the store *or were themselves* seeking employment therein. The District Court held that no labor dispute was involved, that therefore the Norris-LaGuardia Act did not apply, and so issued an injunction against the picketing. The Court of Appeals for the District of Columbia, 67 App.D.C. 359, 92 F.2d 510, sustained the District Court, but upon writ of certiorari the Supreme Court reversed. It held that the dispute was a labor dispute within the meaning of subsections (a), (b) and (c) of Section 13 of the Norris-LaGuardia Act. The Court said (Mr. Justice Roberts) 303 U.S. 552, at 559–563, 58 S.Ct. 703 at 706: "The trial judge was of the view that the laws relating to labor disputes had no application to the case. He entered a decree enjoining the petitioners and their agents and employees from picketing or patrolling any of the respondent's stores, boycotting or urging others to boycott respondent; restraining them, whether by inducements, threats, intimidation or actual or threatened physical force, from hindering any person entering respondent's places of business, from destroying or damaging or threatening to destroy or damage respondent's property, and from aiding or abetting others in doing any of the prohibited things. The Court of Appeals thought that the dispute was not a labor dispute within the Norris-LaGuardia Act because it did not involve terms and conditions of employment such as wages, hours, unionization or betterment of working conditions, and that the trial court, therefore, had jurisdiction to issue the injunction. We think the conclusion that the dispute was not a labor dispute within the meaning of the act, because it did not involve terms and conditions of employment in the sense of wages, hours, unionization or betterment of working conditions is erroneous.

"Subsection (a) of section 13 provides: 'A case shall be held to involve or to grow out of a labor dispute when the case in-

volves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; * * * or when the case involves any conflicting or competing interests in a "labor dispute" (as hereinafter defined) of "persons participating or interested" therein (as hereinafter defined).' Subsection (b) characterizes a person or association as participating or interested in a labor dispute 'if relief is sought against him or it and if he or it * * * has a direct or indirect interest therein.' Subsection (c) defines the term 'labor dispute' as including 'any controversy concerning terms or conditions of employment, * * * regardless of whether or not the disputants stand in the proximate relation of employer and employe.' These definitions plainly embrace the controversy which gave rise to the instant suit and classify it as one arising out of a dispute defined as a labor dispute. They leave no doubt that The New Negro Alliance and the individual petitioners are, in contemplation of the act, persons interested in the dispute.

"In quoting the clauses of section 13 we have omitted those that deal with disputes between employers and employees and disputes between associations of persons engaged in a particular trade or craft, and employers in the same industry. It is to be noted, however, that the inclusion in the definitions of such disputes, and the persons interested in them, serves to emphasize the fact that the quoted portions were intended to embrace controversies other than those between employers and employees; between labor unions seeking to represent employees and employers; and between persons seeking employment and employers.

"The act does not concern itself with the background or the motives of the dispute. * * *

* * * * * *

"The legislative history of the act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construc-

tion of that act. It was intended that peaceful and orderly dissemination of information by those defined as persons interested in a labor dispute concerning 'terms and conditions of employment' in an industry or a plant or a place of business should be lawful; that, short of fraud, breach of the peace, violence, or conduct otherwise unlawful, those having a direct or indirect interest in such terms and conditions of employment should be at liberty to advertise and disseminate facts and information with respect to terms and conditions of employment, and peacefully to persuade others to concur in their views respecting an employer's practices. The District Court erred in not complying with the provisions of the act."

The facts in Fur Workers Union, Local No. 72 v. Fur Workers Union, No. 21238, 70 App.D.C. 122, 105 F.2d 1, are strikingly similar to those in the present case. There, a retail ladies' clothier in the District of Columbia entered into a formal agreement with a union to which all but two of its active fur workers belonged, whereby this union was recognized as the exclusive representative for collective bargaining of all the fur workers in actual employment by the clothier. Another union, through its members and agents, continued to picket the employer's place of business for the purpose of coercing him and his fur workers to violate their agreement, and to cause the employer to rescind recognition of the union. The District Court found that by reason of the picketing, unlawful acts had been committed, and it granted an injunction, although it did not make the other findings specified in the Norris-LaGuardia Act as conditions precedent to granting injunctive relief. The Court of Appeals for the District of Columbia reversed and the Supreme Court affirmed the reversal (308 U.S. 522, 60 S.Ct. 292, 84 L.Ed. 443), but without opinion, relying upon its decisions in Lauf v. E. G. Shinner & Co. and New Negro Alliance v. Sanitary Grocery Co., supra. However, the opinion of the Court of Appeals for the District of Columbia, rendered by Associate Justice Stephens, is most comprehensive and clear, and filled with sound reasoning. The opinion em-

braces an exhaustive analysis of decisions of the Supreme Court and of the lower federal courts bearing upon the question, as well as an equally comprehensive discussion of the position taken by the District Court in granting the injunction. It seems therefore appropriate to quote at some length as follows, from the opinion, 105 F.2d 1, at 11–12, 16–17: "We have given attentive consideration to the position taken by the appellees, but we nevertheless reach the conclusion that it is not a supportable one. The essential predicate of the argument is that once a majority of the employees of a particular employer have, without coercion on his part, made their choice of a bargaining unit, any labor dispute which may be said to have been involved theretofore has ended; therefore the restrictions of the Norris-La Guardia Act upon the issuance of injunctions are inoperative. Applying this proposition to the instant case the appellees say that the trial court has found that a majority of the employees of Zirkin's have selected the appellee union as their collective bargaining agency; therefore the labor dispute has ended and injunction may issue in protection of the choice of the majority. But this argument rests upon the assumption that the Federal courts have power to determine the lawful selection of a bargaining agency by employees. If the trial court had no such power, then its findings of fact in respect of the selection of a bargaining agency by a majority of the employees of Zirkin's without employer coercion are without force, and it cannot be said that the labor dispute has ended so that the Norris-LaGuardia Act restrictions upon the issuance of injunctions are inoperative. We think that the assumption that the trial court had power to make the determination in question is invalid and that the appellees' whole argument therefore falls. We reach this conclusion for the following reasons:

"Neither the National Labor Relations Act [29 U.S.C.A. § 151 et seq.] nor the Norris-LaGuardia Act expressly confers upon the Federal courts power to determine what is the appropriate and lawfully selected collective bargaining unit for employees.

And we think no such power is implied in the statutes mentioned. On the contrary it seems clear that by the National Labor Relations Act Congress intended to confer exclusive initial jurisdiction upon the Board to determine the appropriate and lawfully selected bargaining unit for employees, and intended to give to the Board alone appropriate machinery, to wit, elections machinery, for making such determination. It is true that the Act does not in express terms make the certification power of the Board exclusive. But this nevertheless seems to us to be the plain intent of the Act, and we think that to give it a contrary construction would be inconsistent with the development of labor legislation and the legislative history of the Act itself. The National Labor Relations Act was the culmination of long continued efforts on the part of labor to establish by statute in employees substantive rights of self-organization and selection of collective bargaining representatives; and to define, for the protection of such rights, unfair labor practices by employers; and to constitute, separate from the courts, except in respect of enforcement proceedings, a new agency with both power and machinery appropriate to the enforcement of the rights recognized and to the prevention of the practices denounced. Certainly Congress in the Act did confer upon the Board the power to determine what is the appropriate and lawfully selected collective bargaining unit for employees. And we should not, unless, upon consideration of the Act and its language and purpose, we find it mandatory to do so, put such a construction thereon as would result in the anomalous existence of concurrent initial jurisdiction in both the courts and the Board. In the absence of a principle that, as between administrative tribunals and courts, the jurisdiction first attaching shall prevail—and we know of no such principle —the consequence of such double jurisdiction would be most serious.

\* \* \* \* \* \*

"Apparently invoking the doctrine that it is to be presumed that the legislature would not intend a law to work hardship or injustice and therefore the resolution

of ambiguity in a statute should be in favor of a just and equitable operation of the law, the appellee Zirkin's separately urges upon the court the hardship to an employer who, indifferent as to the choice of a collective bargaining agency by his employees, is caught between the upper and nether millstones of disputing groups or unions. The argument is that unless injunction can issue in such a situation, the employer may well, for lack of other remedy, see his business destroyed, because neither union may be interested in applying to the National Labor Relations Board for an election and certification, and the employer is not, under the present terms of the National Labor Relations Act, given a right to invoke the jurisdiction of the Board to investigate and determine by election proceedings the appropriate bargaining unit and the agency reflective of the will of the majority of the employees.

"While this argument is partially weakened by the fact that it rests upon an assumption that there is no possibility of protection of the employer under the Norris-LaGuardia Act, when under the terms of that Act injunction may issue if the required findings are made, nevertheless the argument of hardship is impressive in this: Even if the evidence and findings are such that injunction may issue under the Norris-LaGuardia Act, still injunction is not an instrument which will excise the cause of the controversy. This can be accomplished only by an election so conducted as to result in a dependably free choice by a majority of the employees. And it is clear also that in the absence of a remedy for the employer, the dispute may proceed indefinitely, for lack of an invocation of jurisdiction of the Board by the competing unions. The union which believes itself to represent a majority may have no incentive to apply for an election; and the union which apparently has less than a majority may resist an election, at least until it is satisfied it has won over enough to constitute a majority. It is clear further that in such a situation there is no remedy for the employer under the National Labor Relations Act. That Act makes no provision for invocation of the election and certification powers of the Board by an employer. The result is an inequality before the law as between an employer and employees in this particular, namely, that while the employer has a substantive right to carry on his business, he lacks a legal remedy for protecting the same against injury through the struggle of competing unions, even though he be indifferent as to the choice of his employees between them; whereas the employees, in respect of their substantive rights of self-organization and collective bargaining, are afforded a protective remedy under the election and certification powers of the Board.

"We are constrained to conclude nevertheless that not even this argument of hardship can avail the appellee Zirkin's. Where, under the language of a statute, the intent of Congress is plain, it is the duty of the courts to apply the statute as it stands, even if the consequence is hardship or injustice. And we think it so clear under the Norris-LaGuardia Act and the National Labor Relations Act, considered together, that the controversy involved in the instant case is a labor dispute and that only the National Labor Relations Board in the first instance can end that dispute by certification, and that no injunction can issue under the Norris-LaGuardia Act in the absence of the findings required thereby, that we must enforce this plain intent of the statute without regard to the hardship upon the employer. Such argument of hardship must be addressed to Congress in respect of the possibility of an amendment of the National Labor Relations Act in such manner as will give to employers a right to invoke the jurisdiction of the Board for a settlement of disputes concerning rights of representation. It would be, in our view, clear judicial legislation, in which we have no right to indulge, for the court to give effect in this proceeding to the argument in question. The Supreme Court has held in [National] Labor [Relations] Board v. Jones & Laughlin [Steel Corp.,] [301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893], that the onesidedness of the Act is a matter of Congressional policy which does not go beyond constitutional limitations."

742

To the same effect as the Fur Union case is a later decision of the Court of Appeals of the District of Columbia, Green v. Obergfell, 73 App.D.C. 298, 121 F.2d 46, certiorari denied 314 U.S. 637, 62 S.Ct. 72, 86 L.Ed. 511.

We fail to find any substantial difference, factually, between the Fur Workers Union case and the case before us except that (1) at the time of the former decision, the Taft-Hartley Act, 29 U.S. C.A. § 141 et seq., was not in existence; and (2) the picketing here is more completely devoid of good faith in that it was instituted solely as a coercive measure against the action of the rival union on the Pacific Coast; that it was a complete sham and pretense of carrying on organizational work among plaintiffs' engineers. It is true that the marine engineers in the present case are not embraced in the term "employee" under the Taft-Hartley Act, because they are "supervisors,"—a class exclusion that has been held valid. See National Labor Relations Board v. Edward G. Budd Mfg. Co., 6 Cir., 169 F.2d 571, certiorari denied Foremen's Ass'n of America v. Edward G. Budd Mfg. Co., 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441. The Taft-Hartley Act does not repeal the provisions of the Norris-LaGuardia Act limiting use of injunctions in labor cases, or enlarge the class of cases over which District Courts are given jurisdiction. Amazon Cotton Mills Co. v. Textile Workers Union of America, 4 Cir., 167 F.2d 183; Amalgamated Ass'n etc. v. Dixie Motor Coach Corp., 8 Cir., 170 F.2d 902. But the term "employer" is defined in the Taft-Hartley Act broadly and "includes any person acting as an agent of an employer, directly or indirectly," with certain named exceptions with which we are not concerned. Also, in the Act, the term "labor organization" is defined as "any organization of any kind, or any agency or employee representation committee or plan, *in which employees participate* and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." (Emphasis supplied.) It is clear that by enactment of the Taft-Hartley Act Congress undertook, in exercise of its power under the commerce clause of the Constitution, art. 1, § 8, cl. 3, either to prohibit altogether or sharply to curtail the use by labor organizations of certain economic weapons because of abuse. In this effort to lessen industrial strife, one of the prohibitions which it enacted was that against picketing when utilized to conscript in a given labor dispute the employees of an employer who is not himself a party to the dispute, i. e. against secondary boycotts. Such a situation is expressly covered by the Act in Title 1, Section 101 (b) (4) (A), 29 U.S.C.A. § 158 (b) (4) (A). In such a situation the employer may obtain injunctive relief under the Act, not by direct complaint of his own, but through complaint made to the Board and thereupon, if the complaint is believed by the Board to be a basis for relief, the Board may petition the District Court for an injuction, pending the final adjudication with respect to the matter. Section 32, 29 U.S. C.A. § 160. See Printing Specialties & Paper Converters Union v. Lebaron, 9 Cir., 171 F.2d 331 and Douds v. International Brotherhood, etc., D.C., 85 Fed.Supp. 429.

It is therefore our view that the broad definitions given to the words "labor organization" and "employer" in the Taft-Hartley Act, although it is required that employees as defined in the Act participate in the organization in order to make it a "labor organization", do not require that the organization be composed *exclusively* of such employees. In other words, the fact that persons other than employees as defined in the Act are members of a labor organization does not prevent an organization, otherwise qualified, from continuing to so function. This interpretation is supported by the provision in the Act, Title I, Section 101 (a), 29 U.S.C.A. § 164 (a) that "Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, * * *" even though the employer need not recognize him as an employee for purposes of collective bargaining. And so it was held in National Labor Relations Board v. Edward G. Budd Mfg. Co., supra. Since this is

true, then, although for the reasons we have explained, this Court is without jurisdiction in the present suit to grant plaintiffs any injunctive relief, we do not believe that they are foreclosed from seeking this relief through the procedure set forth in the Taft-Hartley Act, whereby an employer may ask for injunctive relief through complaint made to the Labor Board, and then, upon proper showing, that Board may petition the District Court for an injunction pending final adjudication with respect to the matter. Section 32, 29 U.S.C.A. § 160. We say this for the reason that, while the Brotherhood of Marine Engineers may have no other members than those who are defined as "supervisors" under the Act, nevertheless this union is an affiliate and under the direct control of the Seafarers International Union of North America, which is, in turn, directly controlled by the parent union, the American Federation of Labor. Seafarers embraces in its membership all types of marine employees, namely, through its other Atlantic & Gulf District branch union, unlicensed engineers, sailors and stewards; and through its Pacific District, unlicensed sailors. Furthermore, defendant Sheppherd testified that he is the Baltimore agent of Seafarers, Atlantic and Gulf District. Thus, although he received his order to establish the picketing here complained of, from King, secretary-treasurer of the Brotherhood of Marine Engineers, it is a mere subterfuge to say that this picketing was not put into effect at the instance of Seafarers. In short, we do not believe that the defendant A. F. of L. union should be allowed to immunize itself under the technical pretext that it is composed of members who are immune from the operation of the Taft-Hartley Act, since, insofar as the present picketing complained of is concerned, it stands in the position of nothing but an alter ego of the American Federation of Labor, acting through the Seafarers International Union, both of which are labor organizations subject to the provisions of the Taft-Hartley Act, and since it is agreed that the picket line actually consists predominantly of members of Seafarers.

Counsel for the plaintiffs have referred to numerous cases in which picketing has been enjoined and rely primarily upon three of these cases, none of which, however, are Supreme Court decisions. These three cases are United Electric Coal Companies v. Rice, 7 Cir., 80 F.2d 1, Gomez v. United Office & Professional Workers, D.C., 73 F. Supp. 679, and Dinny & Robbins v. Davis, 290 N.Y. 101, 48 N.E.2d 280.

In the first of the above cases after a mine operator had contracted with a labor union, many of his employees, although there was no controversy as to terms of employment, joined another union which demanded that the mine operator break the contract with the old union and resorted to disorder and destruction of the operator's property when attempts were made to open the mine. The District Court for the Eastern District of Illinois held this did not constitute a "labor dispute" within the meaning of the Norris-LaGuardia Act, since the mine operator was merely a third party, injured because of a controversy between two unions. On Appeal the Court of Appeals for the Seventh Circuit reversed the District Court and granted relief from the picketing insofar as violence was involved therein but did not direct the enjoining of peaceful picketing. The Court based its conclusion directly upon Section 8 of the Norris-LaGuardia Act, 29 U.S.C.A. § 108, which reads: "No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiations or with the aid of any available governmental machinery of mediation or voluntary arbitration." After reviewing the Congressional history of the Norris-La Guardia Act and referring to the committee report thereon in the Senate to the effect that the bill was not intended to take away from the judicial power any jurisdiction to restrain by injunctive process, unlawful acts or acts of fraud or violence, the Court said (80 F.2d 1, at page 9): "It is difficult for us to assume that the section is

free from doubt in view of the positive statements of its sponsors to the contrary. In fact, it is argued by appellant that appellees have not been able to create a doubt as to the unsoundness of the position by them taken. In other words the parties are hopelessly at variance over the breadth of the construction of the words of section 108. It appears to us that the doubt is not over the meaning of the words, but of their applicability and Senator Norris's statement as to the nonapplicability of the section to *acts of fraud* and *violence* should be considered, and when considered they exclude from the scope of section 108 acts of fraud and acts of violence which destroy or damage the employer's property.

"Every reason would seem to support the position taken by the sponsors of this Act. Refusal to protect property from wilful destruction by others is so contrary to our individual and collective sense of justice that it is quite impossible to extend the meaning of language so as to exclude such protection without affirmative and specific words to that effect." This case, however, was decided prior to the Supreme Court's decisions in Lauf v. E. G. Shinner & Co. and New Negro Alliance v. Sanitary Grocery Co. Inc., supra. So, when the same question again came before the Seventh Circuit Court of Appeals in 1938 in Blankenship v. Kurfman, 96 F.2d 450, that Court held, contrary to its earlier decision, that the term "labor dispute" as used in the Norris-LaGuardia Act did not necessarily imply the relationship of an employee and an employer between the disputants, and that the District Court was without jurisdiction to issue a temporary injunction in a suit brought by members of one union who had been picketed by another union.

With respect to the second case above referred to upon which counsel for the plaintiffs in the present case primarily rely, namely, Gomez v. United Office & Professional Workers, D.C., 73 F.Supp. 679, little need be said because it is clearly so different on the facts from the present case. There, instructors in a New York dancing studio picketed, in connection with a strike, plaintiff's dancing studio located in Washington, D. C., which was connected with the New York studio merely through a contract entitling plaintiff to use the name of the operator of the New York studio but it gave plaintiff no control over that studio. On these facts the District Court for the District of Columbia held that the picketing which was at all times peaceful, did not give rise to a case involving or growing out of the labor dispute which was protected from injunction by the Norris-LaGuardia Act. There was no appeal. The correctness of this decision seems clear. And the same appears to be true with respect to Bakery Sales Drivers Local Union v. Wagshal, 333 U.S. 437, 68 S.Ct. 630, 9 L.Ed. 792, where the Norris-LaGuardia Act was held not to apply.

The third case above referred to on which counsel for plaintiffs rely, namely, Dinny & Robbins v. Davis, is a decision of the Court of Appeals of New York. The appellate court divided four to three in reversing the lower court which had denied an injunction on the following facts: An employer refused to abrogate a collective bargaining contract which he had with a labor union covering wages and working conditions and to execute another contract proposed by a rival union, whereupon the latter set up a picket giving the false impression the employees were striking and that their employer was unfair to organized labor generally. The case arose under the New York Civil Practice Act which in its language is very similar to the Norris-LaGuardia Act, however, neither the latter Act nor any federal decisions are referred to. The appellate court held that the above facts did not constitute a "labor dispute" such as would prevent enjoining the picketing. With respect to the New York law, the Court said in its opinion (48 N.E.2d 280, at page 282): "That act was not designed as an instrument to promote and protect strife between rival labor groups or to injure or destroy the good will and business of innocent employers against whom there was no complaint concerning wages or working or destroy the good will and business of conditions [?] solely because they refused to take sides with one group as against the other. There is nothing in the act to bar a court of equity from restraining

irreparable injury to property and business of an innocent employer against a build-up of an alleged 'labor dispute' such as is indicated in this case. The act does not compel courts of equity to force the breach of a valid contract between an employer and its employees satisfactorily covering wages and working conditions of such employees when made as a result of collective bargaining (Florsheim Shoe Store Co. v. Retail Shoe Salesmen's Union of Brooklyn and Queens, Local 287, 288 N.Y. 188, 42 N.E.2d 480) and to suffer suits for damages for its breach. On the contrary, the Legislature provided in the State Labor Relations Act a due and an orderly process for settling such jurisdictional disputes. Labor Law, Art. 20."

It is true that the Dinny & Robbins case supports the present plaintiffs' contention. However, we are satisfied that it runs counter to the interpretation which the Supreme Court has said must be given to the Norris-LaGuardia Act even though it be conceded that the New York law upon which the Dinny & Robbins case was decided is substantially the same in its basic provisions as the federal statute.

In the course of the present trial, the Court has been informed that in both California and New Jersey injunctions have been granted against picketing involving situations growing out of the same maritime engineers' labor dispute with which we are here concerned, the injunction in New Jersey having been granted under the laws of that State similar to those in New York, which have their counterpart here in Maryland and numerous other States and which are generally known as "little" Norris-LaGuardia Acts.

Whether these State court decisions are correct under the respective local laws on which they are based is not a matter for decision in the present case. However, it should be pointed out that the Supreme Court itself has drawn a distinction between what a State Court and a Federal court may do by way of injunction in labor disputes. For example, in Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985, decided less than a year and a half ago, the Supreme Court had before it the following situation: A group of Negroes demanded of an employer that it hire Negroes at one of its grocery stores as and when white clerks quit or were transferred, until the proportion of Negro clerks to white clerks approximated the proportion of Negro to white customers, which was then about 50%. A California State court enjoined petitioners from picketing the employer's stores to enforce this specific demand. For violation of the injunction petitioners were found guilty of contempt and were sentenced to fine and imprisonment. The Supreme Court found that the policy of California was against racial discrimination, but held, nevertheless, that the State court injunction did not violate petitioners' right of freedom of speech as guaranteed by the due process clause of the Fourteenth Amendment. Since this case dealt with State, not Federal authority, the Norris-LaGuardia Act was not mentioned, and such cases as New Negro Alliance v. Sanitary Grocery Co., supra, were not analyzed.

The crux of the Hughes decision is embodied in the following passages from the Court's opinion, 339 U.S. 460, at pages 465–466, 70 S.Ct. 718, 721: "A State may constitutionally permit picketing despite the ingredients in it that differentiate it from speech in its ordinary context. Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229. And we have found that because of its element of communication picketing under some circumstances finds sanction in the Fourteenth Amendment. * * * Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance. * * * 'A State is not required to tolerate in all places and all circumstances even peaceful picketing by an individual.'" Embodying the same principle as that announced in the Hughes case are International Brotherhood Teamsters Union v. Hanke, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995; Building Service Union v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045; Giboney v. Empire Storage Co., 336

U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Senn v. Tile Layers Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229.

Whether, if the present suit had been brought in a Maryland State court, under the Maryland law such Court would have reached a different result is, of course, something which this Court will not attempt to answer. Suffice it to say, in summary of our conclusion, that while we fully recognize and deplore its inequitable result, we are satisfied that no other conclusion is permitted to this Court under the provisions of both the Norris-LaGuardia Act and the Taft-Hartley Act, and the decisions of the Supreme Court and lower courts interpreting them.

■ Since it is clear that the picketing here in issue had resulted and will result, as long as it continues, in very serious interference with interstate and foreign commerce, this Court, in reaching its conclusion, has not failed to consider the possible relation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, to the present controversy, although this Act has not been pleaded nor its effect argued. With respect to it our conclusion is likewise that it affords no relief to the plaintiffs. In Milk Wagon Drivers' Union v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63, the Supreme Court held that where the requirements of the Norris-LaGuardia Act are not met, a District Court has no jurisdiction to grant an injunction, notwithstanding the suit was based upon alleged violation of the Sherman Act. There, a union of milk wagon drivers employed by local dairies in delivering milk, picketed a large number of retail stores which sold milk bought at wholesale from individuals called * * * "vendors", who delivered the milk by their own trucks from supplies bought from other dairies, under an arrangement whereby the milk which they did not sell was taken back at the full purchase price by the dairies that supplied it. The union claimed that this constituted unfair competition, namely, that it was a device to escape union wages and working conditions, and by picketing the union sought to compel the "vendors" to join it. Whereupon two of the "cut-price" dairies joined with another union organized by their employees, including the "vendors" and a cooperative association of another State from which they obtained their supplies of milk, in a suit charging the milk drivers' union and its officers with a conspiracy to restrain interstate commerce in milk, in violation of the Sherman Act and sought an injunction against the picketing and attendant trespassing.

The Court of Appeals for the Seventh Circuit, 108 F.2d 436, in reversing the District Court which had denied injunctive relief, decided that the picketing constituted a secondary boycott in violation of the Sherman Act and for this reason, regardless of the Norris-LaGuardia Act, the District Court had jurisdiction to grant an injunction, even though the case arose out of or involved a labor dispute. The Supreme Court reversed the Court of Appeals and held that since the requirements of the Norris-LaGuardia Act had not been met, the District Court had no jurisdiction to grant an injunction, notwithstanding alleged violation of the Sherman Act. The Supreme Court said (311 U.S. 91, 101, 61 S.Ct. 122, 127): "The Norris-LaGuardia Act—considered as a whole and in its various parts—was intended drastically to curtail the equity jurisdiction of federal courts in the field of labor disputes and this court has said that 'the legislative history of the act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of that Act.'" The Court cited the New Negro Alliance case, supra.

A little later, in United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, the Supreme Court, in a criminal prosecution, under the Sherman Act, of Union carpenters who refused to work for a brewing company by which they were employed and whose premises they picketed attempting to persuade members of other unions similarly to refuse work, held that the conduct of the union was protected from prosecution under the Sherman Act by Section 20 of the Clayton Act, 29 U.S.

C.A. § 52, when construed in the light of the broad definition of a labor dispute in the Norris-LaGuardia Act. The Court said 312 U.S. 219 at page 231, 235–237, 61 S.Ct. 463, 466: "The Norris-LaGuardia Act removed the fetters upon trade union activities, which according to judicial construction § 20 of the Clayton Act had left untouched, by still further narrowing the circumstances under which the federal courts could grant injunctions in labor disputes. More especially, the Act explicitly formulated the 'public policy of the United States' in regard to the industrial conflict, and by its light established that the allowable area of union activity was not to be restricted, as it had been in the Duplex case, to an immediate employer-employee relation. Therefore, whether trade union conduct constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct.

\* \* \* \* \* \*

"The relation of the Norris-LaGuardia Act to the Clayton Act is not that of a tightly drawn amendment to a technically phrased tax provision. The underlying aim of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction. \* \* \* The Norris-LaGuardia Act reasserted the original purpose of the Clayton Act by infusing into it the immunized trade union activities as redefined by the later Act. In this light § 20 removes all such allowable conduct from the taint of being 'violations of any law of the United States', including the Sherman Law.

"There is no profit in discussing those cases under the Clayton Act which were decided before the courts were furnished the light shed by the Norris-LaGuardia Act on the nature of the industrial conflict. And since the facts in the indictment are made lawful by the Clayton Act in so far as 'any law of the United States' is concerned, it would be idle to consider the Sherman Law apart from the Clayton Act as interpreted by Congress. Cf. Apex Ho-

siery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311. It was precisely in order to minimize the difficulties to which the general language of the Sherman Law in its application to workers had given rise, that Congress cut through all the tangled verbalisms and enumerated concretely the types of activities which had become familiar incidents of union procedure."

To summarize the conclusions of this Court in the present case, they are as follows: The complaint must be dismissed because this Court has no authority to grant the plaintiffs injunctive relief in view of the provisions of the Norris-LaGuardia Act. However, the present plaintiffs are believed to have a right to invoke the procedure provided in the Taft-Hartley Act through which they may petition the National Labor Relations Board to, in turn, petition this Court for appropriate injunctive relief.

An order will be signed in accordance with this opinion.